Kenneth PRICE, et al., Appellants,

v.

DISTRICT OF COLUMBIA BOARD OF ELECTIONS & ETHICS, et al., Appellees, Jay Hessey, Intervenor.

Herbert A. BEHRE, III, et al., Petitioners,

v.

DISTRICT OF COLUMBIA BOARD OF ELECTIONS & ETHICS, Respondent, Jay Hessey, Intervenor.

Jay HESSEY, Cross–Petitioner,

v.

DISTRICT OF COLUMBIA BOARD OF ELECTIONS & ETHICS, Respondent.

Nos. 93–CV–1052, 94–AA– 248 and 94–AA–299.

District of Columbia Court of Appeals.

Argued June 15, 1994.

Decided Aug. 4, 1994.

---

Vincent Mark J. Policy, for appellants in 93–CV–1052 and petitioners in 94–AA–248.

William H. Lewis, Gen. Counsel, with whom Alice P. McCrory–Miller, Counsel, was on brief, for appellees in 93–CV–1052, respondent in 94–AA–248, and respondent in 94–AA–299.

Carol R. Golubuck, with whom Katherine A. Meyer, was on brief, for intervenor in 93–CV–1052, intervenor in 94–AA–248, and cross-petitioner in 94–AA–299.

Before FERREN and KING, Associate Judges, and PRYOR, Senior Judge.

KING, Associate Judge:

The proposed initiative measure in this consolidated appeal, petition, and cross-petition for review initially sought to amend the "Real Property Tax Revision Act of 1974," formerly codified in D.C.Code § 47–825, creating the Office of Public Advocate for Assessments and Taxation with authority to appear on behalf of the public in administrative property tax assessment proceedings. Intervenor/cross-petitioner Jay Hessey ("Hessey") submitted the initiative measure to appellee/respondent the District of Columbia Board of Elections and Ethics ("the Board") on January 22, 1990, and is now before this court for the third time. *See Hessey v. Burden,* 584 A.2d 1 (D.C.1990) (*Hessey I*); *Hessey v. Burden,* 615 A.2d 562 (D.C.1992) (*Hessey II*). In the previous appeals, this court rejected challenges to the substance of the proposed initiative. The dispositive issue presented here, in the petition for review, is whether the Board correctly determined that the initiative petition contained the requisite number of valid elector signatures required to qualify the initiative measure for the ballot. We hold that it did not and, therefore, we reverse the Board on that issue and dismiss both the cross-petition for review and the appeal as moot.

I.

The facts underlying the dispute are set forth in detail in *Hessey I* and *Hessey II,* and we will not repeat them here. In *Hessey II,* we held that the initiative measure was the proper subject of initiative, and we remanded the case with clear instructions that "[g]iven the tortuous path which the case has followed thus far, ... the only matter properly before the court will be the opponents' challenge to the summary statement, short title, and legislative form." *Hessey II, supra,* 615 A.2d at 581. While on remand, however, the unanticipated occurred: The Council of the District of Columbia ("the Council") enacted the "Real Property Tax Assessment Appeal Process Revision Amendment Act of 1992" ("the

1992 amendments"),[1] repealing D.C.Code § 47–825 and enacting D.C.Code § 47–825.1 (1993 Supp.) in its place.[2]

Hessey thereafter moved to file a supplemental answer in the trial court, suggesting revisions to the summary statement, short title, and legislative form, in light of the amendments to the underlying statute. He also filed a renewed motion for summary judgment[3] which, if granted, essentially would require the Board to approve the initiative measure for further processing. Appellants Kenneth Price, James Durham, the Apartment and Office Building Association of Metropolitan Washington, and the Washington, D.C. Association of Realtors, Inc., (collectively referred to as "Price") and the Board opposed the motions, contending that Hessey should be required to file a new proposed initiative measure and begin the initiative process again since the underlying statute had been repealed.

On June 11, 1993, the trial court granted the motion to file the supplemental answer, ruling that the 1992 amendments did not affect the substance of the initiative. The trial court denied the motion for summary judgment without prejudice to its renewal after the Board had been given the opportunity to reformulate the summary statement, short title, and legislative form.[4] The Board, however, believing that it was without authority to make such changes,[5] declined to further process the initiative.[6]

On July 27, 1993, Hessey filed a second renewed motion for summary judgment. On July 30, 1993, the trial court, after learning of the Board's refusal to reformulate, approved the final version of the summary statement and legislative form and entered summary judgment for Hessey. Price timely noted an appeal of the trial court's ruling, No. 93–CV–1052 ("the civil action"), contending the trial court exceeded its authority by reformulating the legislative form and summary statement.[7]

At a hearing held on August 4, 1993, the Board certified the final version of the summary statement, short title, and legislative form. The Board also approved Hessey's initiative petition forms and determined that 13,233 valid elector signatures were required in order to certify the initiative measure for the ballot. In fixing the number of required signatures, the Board relied on the "Initiative, Referendum, and Recall Procedures Act of 1979" ("the IPA"),[8] specifically D.C.Code § 1–1320(i).[9] Applying the provisions of that

---

1.  D.C.Law 9–241, § 2, 40 D.C.Reg. 629 (1993) (effective March 17, 1993).

2.  The 1992 amendments abolished the Board of Equalization and Review, replacing it with the Board of Real Property Assessments and Appeals. In addition, the 1992 amendments adopted new procedures for resolving property tax assessment appeals with respect to the composition of the board and the duties of its members.

3.  The original motion for summary judgment had been stayed pending the outcome in *Hessey II*.

4.  The trial judge suggested that Hessey submit the initiative measure to the Board anew to avoid the issue of "the impact of the subsequent amendment" of D.C.Code § 47–825, reasoning that by doing so the parties might avert further prolonging the litigation over the initiative measure. Hessey, however, chose not to follow the trial judge's recommendation.

5.  In the appeal of the civil action, the Board has forcefully argued that neither the Board nor the trial court was authorized to make the changes in the measure that the trial court made here. Since we dismiss that appeal as moot, we do not reach that issue. *See infra* text at p. 13 and note 20.

6.  Subsequent to the Board's determination, Hessey withdrew his request to modify the short title.

7.  On appeal, Price also contends the trial court exceeded its authority by failing to allow him ten days to respond to the second renewed motion for summary judgment. *See* Super.Ct.Civ.R. 56(c).

8.  D.C.Law 3–1, § 2(c), 25 D.C.Reg. 9454 (1979) (codified as amended in D.C.Code §§ 1–1320 to –1326 (1992)).

9.  It provides, in part:
    In order for any initiative or referendum measure to qualify for the ballot for consideration by the electors of the District of Columbia, the proposer of such an initiative or referendum measure shall secure the valid signatures of registered qualified electors upon the initiative or referendum measure equal in number to 5 percent of the registered electors in the District of Columbia: Provided, that the total signatures submitted include 5 percent of the registered electors in each of 5 or more of the 8 wards. . . .

act, the Board determined that the November 1989 voter registration roll applied in calculating the requisite number of signatures that are required. Each party, or an attorney who represented each party, was present at the hearing, and although a memorandum regarding the signature requirement was distributed to counsel and the Board specifically asked if there were any objections, none was raised to the use of the November 1989 roll.

On January 31, 1994, Hessey filed the initiative petition, which contained 23,225 signatures, and the Board posted it for a ten-day comment period, pursuant to D.C.Code § 1–1320(o)(1). Petitioners Herbert A. Behre, III, Joan Thurston–Tyree, and the Committee to Challenge Initiative No. 35 (collectively referred to as "Behre") challenged the petition, contending that it did not contain the requisite number of valid signatures. Specifically, Behre contended that pursuant to the "Initiative, Referendum, and Recall Charter Amendments Act of 1977" ("the Charter Amendments"),[10] the Board should have relied on the December 1993 rather than the November 1989 voter registration roll. It is not disputed that if the December 1993 roll is the correct one, then 16,352 valid signatures

would be required to qualify the initiative for the ballot.

On February 17, 1994, a challenge hearing was held regarding the petition. The Board, relying on D.C.Code § 1–1320(i), denied Behre's challenge, finding that the petition contained 15,825 valid signatures. Since that number exceeded the 13,233 figure established by using the November 1989 roll, the petition was accepted for further processing. Behre then petitioned this court for review of the Board's action (No. 94–AA–248), contending the Board erred in ruling that the November 1989 roll was the applicable voter registration roll.[11]

## II.

■ These consolidated appeals present a number of issues; however, as both counsel for the initiative opponents and the Board acknowledged at oral argument, if we hold that the Board erroneously failed to follow the Charter Amendments in determining the requisite number of valid elector signatures required in order to qualify the initiative measure for the ballot, then the appeal of the civil action and Hessey's cross-petition would be moot. *See* 3 DCMR § 1011.3 (1990). We will consider first, therefore, Behre's claim

---

10. D.C.Law 2–46, § 2, 24 D.C.Reg. 199 (1978), as amended by Pub.L. No. 95–526, § 1(3), 92 Stat. 2023 (1978) (codified as amended in D.C.Code §§ 1–281 to –287 and §§ 1–291 to –295 (1992)).

11. Behre also contended before the Board that: (1) 539 signatures, which had been initially disqualified, but subsequently re-qualified, should be struck; (2) 200 signatures on petitions where the circulator failed to fill in the date of circulation should be rejected; and (3) all 1,318 petition sheets should have been rejected since none of the petition circulators' statements had been verified. In support, Behre argued that the Board's procedures, set forth in its "Standard Procedures for Petition Verification," for "re-checking" disqualified elector signatures and verifying circulators' statements were invalid because those procedures had never been published for public comment, were not promulgated regulations, and were, therefore, illegal.

The Board agreed with Behre's second contention, ruling that the circulators should have noted the dates on the petitions and disqualified 200 signatures; however, the Board rejected the other two challenges. The total number of 15,825

valid signatures found by the Board does not include the 200 signatures thus rejected. In his petition for review in this court, Behre renews the first and third contentions. In his cross-petition for review (No. 94–AA–299), Hessey maintains that the Board erred in disqualifying the 200 signatures. In light of our holding, *see infra* text at p. 13 and note 20, we express no view on any of these issues.

Behre maintains that Hessey's petition for review from the Board's determination was not timely filed, citing D.C.Code § 1–1312(o)(2) (1992). It is not clear to us, however, that the provision cited by Behre is applicable since D.C.Code § 1312(o) addresses Board review of nominating petitions for candidates rather than the initiative and referendum process. In any event, it appears that the order, which was signed by the Board Chairperson on March 2, 1994, was issued outside the presence of the parties, and there is no indication in the record when the order was mailed to the parties. *See* D.C.App.R. 15(a) ("If an order or decision is made out of the presence of the parties and notice thereof is by mail, the petitioner shall have five additional days from the date of mailing" to file a petition for review). Thus, Behre has not demonstrated that the petition is untimely.

that the Board erred in applying the provision of the IPA rather than the Charter Amendments.

Behre contends the Board erred in relying on D.C.Code § 1–1320(i), instead of the Charter Amendments, when it determined that Hessey had obtained the requisite number of valid signatures. The Charter Amendments were enacted in 1978, giving District residents the right of initiative, referendum, and recall. *See* D.C.Code § 1–281(a). The Charter Amendments provide that an initiative may be proposed:

> by the presentation of a petition to the District of Columbia Board of Elections and Ethics containing the signatures of registered qualified electors equal in number to 5 percent of the registered electors in the District of Columbia: Provided, that the total signatures submitted include 5 percent of the registered electors in each of 5 or more of the City's wards. The number of registered electors which is used for computing these requirements shall be according to the latest official count of registered electors by the Board of Elections and Ethics which was issued 30 or more days prior *to submission of the signatures for the particular initiative or referendum petition.*

D.C.Code § 1–282(a) (emphasis added). There is no dispute that if the Board applied the Charter Amendments, the December 1993 roll would be used in determining the requisite number of signatures because that was the last official count prior to the time the petition was submitted to the Board on January 31, 1994. Thus, the number of required signatures would be 16,352 and because only 15,825 valid signatures were obtained, the measure would fall short of the number required for placing the initiative measure on the ballot.

On the other hand, about a year after the Charter Amendments were enacted, the Council passed the IPA, which provides, in relevant part, that:

> The number of registered electors which is used for computing these requirements shall be consistent with the latest official count of registered electors made by the Board 30 days prior *to the initial submission to the Board of the initiative or referendum measure, pursuant to subsection (a) of this section.*

D.C.Code § 1–1320(i) (emphasis added).[12] It is not disputed that under this provision, the November 1989 roll should be used because that was the last official count before the date of the initial submission of the initiative measure on January 22, 1990. By using that roll only 13,233 valid signatures would be required, and because 15,825 valid signatures were obtained, the initiative could be placed on the ballot.[13]

In deciding that D.C.Code § 1–1320(i) applied, the Board reasoned that Title VII, Section 752 of the "District of Columbia Self-Government and Governmental Reorganization Act" ("the Self–Government Act")[14] granted the Council authority to enact legislation concerning elections. Section 752 provides: "Notwithstanding any other provision of this Act or of any other law, the Council shall have authority to enact any act or resolution with respect to matters involving or relating to elections in the District." The Board thus determined that the Self–Government Act granted the Council authority to enact the IPA and that it should follow D.C.Code § 1–1320(i) as legislation implementing the Charter Amendments.

■ Behre contends, however, that the Board erred in relying on D.C.Code § 1–1320(i). In support, he cites *Convention Ctr. Referendum Comm. v. District of Columbia Bd. of Elections & Ethics,* 441 A.2d 889, 915

---

12. *See also* 3 DCMR § 1004.2 (1990) ("The number of registered qualified electors used for computing the signature requirement in § 1004.1 shall be based upon the latest official count of registered qualified electors made by the Board thirty (30) days prior to *initial submission of an initiative* or referendum measure pursuant to § 1001.") (emphasis added).

13. We could find no explanation, in the legislative history of the IPA, for the Council's departure from the formulation in the Charter Amendments regarding the elector signature requirement.

14. Pub.L. No. 93–198, § 752, 87 Stat. 836 (1973).

(D.C.1981) (en banc) (*"Convention Center II "*), where a plurality of judges concluded that "[a]s implementing legislation [of the Charter Amendments], the Initiative Procedures Act is valid, of course, only insofar as it conforms to the underlying Charter Amendments." Thus, to the extent any IPA provision is inconsistent with the Charter Amendments, the latter controls. *See id.; see also Seman v. District of Columbia Rental Hous. Comm'n,* 552 A.2d 863, 866 (D.C.1989) ("an agency adjudication cannot stand if the proceedings on which it is based violates a statute even though justified by rules or regulation the agency itself has published") (citation omitted); Title VII, Section 761 of the Self–Government Act ("To the extent that any provisions of this Act are inconsistent with the provisions of any other laws the provisions of this Act shall prevail and shall be deemed to supersede the provisions of such laws.").[15]

Moreover, Behre maintains the Board erred in concluding that the Council had authority to override the Charter Amendments by enacting implementing legislation. While the Charter Amendments grant the Council authority to "adopt such acts as are necessary to carry out [its] purpose," D.C.Code § 1–287, the plurality concluded in *Convention Center II that the Council may not enact legislation inconsistent with the Charter Amendments. Convention Center II, supra,* 441 A.2d at 915. Nor could the Council amend the Charter Amendments by enacting the IPA since, as the Self–Government Act clearly provides, the Charter may be amended only as provided in D.C.Code § 1–205(a) (1992).[16] Further, nothing in Section 752, upon which the Board relies, grants the Council authority to amend the Charter; that provision only grants the Council authority "to enact any act or resolution with respect to matters involving or relating to elections in the District."

Nonetheless, Hessey contends the Charter Amendments themselves had no legal effect until the Council enacted the IPA as legislation implementing the Charter Amendments.[17] In support, he relies on *Convention Ctr. Referendum Comm. v. Board of Elections & Ethics,* 399 A.2d 550 (D.C.1979) (*Convention Center I* ), which held that the Charter Amendments were not self-executing: "Since no general grant of rule-making authority is included in the amendments, it is evident that the Council intended to reserve to itself authority over the specific procedures." *Id.* at 553. Hessey's reliance on *Convention Center I* is misplaced because Behre does not contest the authority of the Council to enact legislation implementing the Charter Amendments. Rather, he argues, as was made clear in *Convention Center II,* that legislation implementing the Charter Amendments is valid only if it does not conflict with the Charter Amendments. We agree. Thus,

---

**15.** Hessey contends that the Council's authority to enact legislation regarding elections flows from the Charter Amendments themselves. He relies on Section 7, which provides: "The Council of the District of Columbia shall adopt such acts as are necessary to carry out the purpose of this subchapter within 180 days of the effective date of this subchapter." D.C.Code § 1–287. The Board determined, however, that Section 752 was the Council's source of authority. Moreover, regardless of whether Section 752 or Section 7 of the Charter Amendments applies, *Convention Center II* made clear that the Council may not enact legislation that is inconsistent with the Charter Amendments.

**16.** It provides:
  The charter set forth in title IV (including any provision of law amended by such title), except §§ 1–221(a) and 1–241(a), and part C of such title, may be amended by an act passed by the Council and ratified by a majority of the registered qualified electors of the District voting in the referendum held for such ratification. . . .

**17.** Hessey also argues that Behre is barred by the doctrine of laches from contending the initiative petitions do not contain the requisite number of valid elector signatures. Since that issue was not raised before the agency, however, the court need not consider it. *See Daniel v. District of Columbia Ins. Admin.,* 639 A.2d 590, 593 n. 4 (D.C.1994) (this court does not have authority to consider issues raised for the first time on review of an agency determination) (citations omitted); *Lawrence v. District of Columbia Bd. of Elections & Ethics,* 611 A.2d 529, 533–34 & n. 11 (D.C. 1992) (petitioner who failed to contest factual assertions before the Board could not claim on appeal that the Board's determination was not supported by the record); *see also King v. Kitchen Magic, Inc.,* 391 A.2d 1184, 1187 (D.C.1978) (issue whether there was excusable neglect should be determined by the trial court in resolving whether laches applies).

to the extent D.C.Code § 1320(i) conflicts with the Charter Amendments, the latter controls.[18]

We hold, therefore, that the Board erred in determining that the Council had authority to enact a provision that was in conflict with the language contained in the Charter Amendments. We further hold that D.C.Code § 1–1320(i) is violative of the Charter Amendments to the extent that it is inconsistent with D.C.Code § 1–282(a) and cannot stand. In short, the number of registered electors required to qualify an initiative or referendum measure for the ballot shall be determined in accordance with the requirements set forth in the Charter Amendments.[19] *See* D.C.Code § 1–282(a).

In sum, the Board erred in applying D.C.Code § 1–1320(i), *i.e.,* Hessey should have been required to obtain 16,352 valid signatures. As the initiative petition fell short of that mark, we hold that the Board also erred in certifying the initiative measure for the September 1994 ballot.[20] Therefore, since the initiative measure fails "to qualify for the ballot due to numerical insufficiency of the petition[, Hessey] must commence the

respective process anew."[21]   3   DCMR § 1011.3.   Accordingly,

*No. 93–CV–1052 is hereby, dismissed as moot,*

*No. 94–AA–248 is hereby, reversed, and,*

*No. 94–AA–299 is hereby, dismissed as moot.*

---

18. Hessey also contends that because the Charter Amendments provide for the use of "the latest official count of registered electors by the Board ... which was issued 30 *or more* days prior to submission of the signatures," D.C.Code § 1–282 (emphasis added), the Council has discretion to designate the issuance date of the count of electors used to evaluate the signature petition so long as the date is *at least* thirty days prior to the submission of the signatures. Because the IPA's designation of the issuance date for the count as "30 days prior to the initial submission to the Board of the initiative," D.C.Code § 1–1320(i), is "30 *or more* days prior to the submission of the signatures," the two provisions are consistent.

Even if the phrase "30 or more days" in the Charter Amendments provision is read broadly, however, the provision makes clear that the *"latest* official count of registered electors" should be used. *See* D.C.Code § 1–282(a). In this case, the December 1993 roll was certainly "the *latest* official count of registered electors by the Board of Elections and Ethics which was issued 30 or more days prior to the submission of the signatures for the particular initiative or referendum petition." *Id.* (emphasis added). Because, under the IPA, the November 1989 roll is "the latest official count of registered electors made by the Board 30 days prior to the initial submission to the Board of the initiative," the Charter

Amendments and the IPA are clearly inconsistent. The Board, therefore, erred in applying the signature requirements of the IPA, D.C.Code § 1–1320(i). *See Convention Center II, supra,* 441 A.2d at 915; D.C.Code § 1–208(a).

19. To the extent 3 DCMR § 1004.2 is inconsistent with D.C.Code § 1–282(a), it too is violative of the Charter Amendments. *See supra* note 12.

20. Having concluded that the petition does not contain the requisite number of signatures, the issue concerning the trial court's reformulation of the summary statement and legislative form is moot. *See supra* text at p. 4 and note 5. Similarly, the issues raised regarding the Board's disqualification of signatures are also moot. *See supra* note 11.

21. At oral argument counsel for the Board represented to the court that in the event the court holds that the certification by the Board was invalid, as we have done today, he would recommend to the Board that it accept the initiative measure as it was re-drawn by the trial court and to "process it in one day" so that the initiative proponents could attempt to obtain placement of the initiative measure on the ballot at the earliest election possible.